Our last oral argument of the morning is docket number 19-1345. Solutran v. Elavon. May it please the court, your honor. Tom Vitt for Appellants U.S. Bank and Elavon. We ask this court to reverse the district court's judgment for two independent reasons. First, the infringement finding is based on a claim construction of said data that ignores the definition of that term. Let me ask you first, if we reverse on the 101, that's all we need to do, right? Either ground can independently be grounds for reversal. You don't have to reach the other ground. That's correct. Okay, so let me make sure I understand it. In that sense, your appeal, it's a little conditional in the sense that if we reverse on one, in your mind, we don't have to address the other. That's right, because we've won the case then. Either one would end the case and require entry of judgment in our favor. Because your section 101 invalidity challenge was in the form of a counterclaim, right? It wasn't an affirmative defense. Well, both, your honor. It was made as an affirmative defense and it was also stated as a counterclaim. But there's no remaining fact issues that would be required. This court can address it and would resolve the case. Okay. And then the second issue, of course, is the 101 issue that the Solitran patent claims an abstract idea in a way very similar to this court's prior cases. Unless the court has a different preference, I will propose to address the claim construction issue first and then the section 101 issue. So the claim construction issue really turns on the language of the claim. We have a claim where the patent gives us a definition of the term said date. As I understand it, the district court during the Markman construed said data in a way that you would like, as in the comparison step would include the transaction amount being compared between the image of the check and the data file created. But then on summary judgment, the lower court seemed to change its mind on that. Can you explain what happened there and why there was a migration between what I think I saw the district court say during the Markman construction and then what the district court ultimately said in its summary judgment memorandum? Your Honor is exactly right. In the claim construction order, we won the issue and the court said multiple times. I'm asking why. Why? Why was there a shift? The court, the only evidence we have about that is the court says that she was clarifying her order, her prior order. She does not, the district court does not acknowledge that this was in fact a reversal of the prior order. So it was a clarification. Both sides moved for summary judgment. We moved for summary judgment thinking that we had won. And the other side moved for summary judgment arguing the claim construction that the judge ultimately adopted was in fact in the existing order. But we don't think that's correct. The court clearly construed the comparison step to require the comparison of the amount in the original Markman order. That's right, Your Honor. And that first order was the right order. Of course, you have de novo review. But the claim language requires that construction. We have a definition in step A that the said data includes an amount of a transaction associated with MICR information. And then said data has to mean the same thing in the comparing step. So that at least, the compare step has to at least include that amount. And that really ends the case. That's the definition. You're relying primarily on the plain claim language, right? We are. The specification seems to suggest that the best source for comparison, or most often suggests what the comparison data is, is the MICR data. So, Your Honor, actually what the specification does over and over again is talk about comparing MICR information and the amount. Both items would be compared in what's called out in the specification. Do I understand correctly that the MICR information is going to be unique for each check? Because it's going to have the bank routing number, the account number, and the check number. That's right. And so it would be the most natural thing to compare would be the MICR information. But Salyutran, as the master of its claim, wrote a definition of said data to call for a comparison of amount associated with MICR information. That's correct, Your Honor. And the specification really does, over and over, talk about comparing the amount. So it also supports our construction that we're advocating here, Your Honor. So I want to turn to, if I could, the second point. The plain language really is clear enough by itself to require this definitional reading. But the file history also requires reversal. And that's because Salyutran asked the patent office for a claim that said comparing said image files with said data files to find matches. And that claim was rejected. But that's what the district court's order does. The district court says specifically it's the data file which must be compared to the digital images. That was the rejected claim language. The patent office required said data to be the comparison. And so reinforcing the definition... But I didn't see anything in the prosecution history that really drove home the idea that what the examiner was hunting for and what the patent owner agreed to was the idea that said data necessarily means we're talking about the transaction amount. I didn't see anything so specific as to that. It was more about we don't want you to say data file. We would just prefer you to say data because that lines up better and more cleanly with the claim language. Well, but that does answer the question. You are right, Your Honor, that the patent prosecution history does not call out this exact issue we're debating now. It didn't have to because that requirement of said data is narrower than anything in the data file. And under this court's precedent, under the law we cite in our brief, said data has to mean the same thing in Step D as it means in Step A. So I do want to move on to the 101 because I see my time is passing. The 101 issue there, the critical issue is we have an electronic check processing patent that claims really a narrow improvement where we're moving the checks from one place to another and then imaging them after crediting. And that patent claim, that's the concept of the invention. That's what the claim is directed to, that imaging after crediting. That's what their experts said. That patent claim, if you compare that to this court's decision in content extraction, in data treasury, and in inventor's holdings versus bed, bath, and beyond, we cite three cases that are very close. It's financial transactions processing. It's check processing. And this case can't be conceptually distinguished. The district court emphasized the physical nature of the checks and handing them over to a third party and having them scanned. I think that you suggest in your brief that these other cases also have that kind of physical nature with respect to checks. Am I correct in remembering that? You're absolutely right. Certainly content extraction, a person is physically handling a check in a deposit slip and interacting with an ATM machine. Bed, bath, and beyond is even better because the person is physically going to the store, getting the code, and getting documents or getting products shipped to them. And this imaging step... When you say bed, bath, and beyond, is that inventor holdings? It is, yes. I apologize. Yes, that's right, Your Honor. And in data treasury and many other cases that we cite, you can't get away from an abstract idea. These types of cases of no technology, no improvement in computers, and by just saying, oh, we're going to just write a clever patent and have a physical step. There are many, many cases to that effect. That's just not good enough. Is it your understanding that this claim covers an embodiment where the check scanning is still going on in the back office? I mean, in that sense, the paper check is literally being moved from the location of where it's being received at the point of purchase terminal. By the court's claim construction, it would cover the movement receiving at a different location in the back office. It could potentially cover that. Because that already was a conventional step of taking paper checks and then running them back into a back office somewhere and then doing the check scanning there. Literally every step in the claim is conventional. The only advance that they claim is this delaying the imaging step. Everything is conventional. And this imaging and moving checks from one spot to another is conventional banking practice. Previously, the comparing step had been performed, or no? The comparing step hadn't been performed in terms of a novelty 102 type. If we were in a pure novelty analysis in an electronic check processing, we did have art where there was comparison steps, but not exactly in this setting. But that's a conventional bank practice. There isn't an argument about that, that that's anything other than a conventional bank practice of reconciling two items of data. It was known to verify the content of a check, like the physical check, against a data file created at the point of purchase that collects all this data from the check. So this is conventional practice of reconciling. I guess if there's anything different here, it's the idea of instead of using the physical check to do that comparison and verification, you're using a scanned image of that paper check to do that same comparison exercise. That's right. You're doing a comparison with a computer of a digital image and a data file. Is there any argument from the patent owner below that that's an inventive concept? They do argue that the ordered combination is, to meet step two, they're relying on... My question is, did the patent owner ever argue that it's something nifty to do the verification comparison step with the scanned image of the physical check against the data file as opposed to the actual paper check? No, they relied purely on the ordered combination that they say is set out in step two. But when you say ordered combination, you're saying they accelerate the crediting of the merchant's account before doing the check scanning exercise. And that's what is their kernel of inventive contribution. But I saw them also argue that, well, the inventors have formulated two different paths of this overall check processing method where one path is occurring in one place and another path is occurring in another place. And so, therefore, there's advantages to that. So this is just exactly the core of the issue. The first path, the data file and the crediting of the merchant, is the prior art. It's conventional. It's in every check processing. The only, quote, inventive concept they claim is the exact abstract idea of itself. And it's actually the delaying of the imaging until after the crediting. They don't speed up the crediting, Your Honor. And I see that I meant to... Okay. Thanks. Here from the patent owner. Mr. Gilbertson? Yes. Good morning. May it please the Court. I'll follow the same sequence of argument unless the Court... Can I just ask you one question? Of course. I'm sorry. I'm going to take you to 101 first because... Yeah. I understood from the argument that you are only arguing step two as an ordered combination being the inventive concept. Is that correct? That that's all you've argued? Yeah. As to the inventive concept, what matters here is that we've got... Deere in 1981 said that you can have an ordered combination that all of its constituent parts have been in common use. But... And that's what we have in this case is an ordered combination. We're here in front of this Court three years ago having just litigated this topic of whether there's something patentable about this invention at the PTAB. And there was lots of discussion about this very point. And what we argued there, and this goes to one of the questions that your colleague asked as well a little bit earlier. What we pointed out there was that what the solutran inventors did is took something that everybody understood happened in a certain way and broke it apart into two different pieces that happened at two different places, two different times, by two different machines. The character of the claim... Well, no. I guess you're asking about inventive concept in particular. Yeah. I'm asking about step two, inventive concept, and what your argument was below. Yeah, the argument below was absolutely that this is an ordered combination that didn't exist. So part of what this Court's cases look at, of course, is the thing that's being offered as an inventive concept, something that was well understood, routine, or conventional. It would do great violence to the words understood and routine and conventional to use them to describe something that never existed. So can you just articulate in a sentence what's the inventive concept here? The inventive concept is the ordered combination of taking what used to happen in a single place at a single time by a single machine and break it into two different parts, two different paths, such that part of the process happens early at the merchant's facility, that the checks are then physically moved to a different location, and another part of the process happens then at a different place, different time, different machine. And then because Salyutran has done that, because Salyutran has approached that question completely differently than anyone else had, it then has to bring those things back together in step D by doing a comparing and matching process. That's the ordered combination. As I understand your background section, your background section talked about how it was already known and established in electronically processing checks at merchant's stores to create data files at the point of purchase that has all the check data, and that you could also scan those paper checks right there at the point of purchase, or optionally you could do the check scanning in a back room or a back office of the merchants. It depends on what process you're trying to use. There's this back office conversion process that's most at issue with this patent. In the back office conversion process, all of that happens in the back office. Well, when I looked at your patent specification, it talks about how in column two, how you can do the data file at the point of purchase, and optionally the merchants can keep an image of the check, and then an alternative method of handling the checks has been proposed by which merchants scan their checks in a back office, typically at the end of the day. So to me, that reads like the check scanning, it can happen right there at the point of purchase, or it can happen in a back room at the end of the day. I think the thing to point out there that's helpful on that point is the specification in the column you're talking about is discussing two different ways, two different prior art systems. So the POP system, point of purchase system, that Walmart happens to use, that's a system where there's scanning that happens at the point of purchase. The context that we're in, the context that these inventors were dealing with, was not the POP system. It was the back office conversion rules that were getting ready to come out. And what was understood about those rules, and this is what is stated in the specification in columns two and spills over to three, is that in that process, if anybody wanted to do back office conversion, they took the checks into the back office, and there in the back office went through the steps that the BOC rules required. So if your Honor's question is, was it known in the art generally that you could scan a check at the point of purchase, yes, I agree, POP did that. As to practicing back office conversion, which is the problem that these inventors were facing, the problem that these inventors were trying to come up with a solution for, that was not the case. You're saying that back office conversion was not conventional at the time the application was filed? So back office conversion rules had come out, and people were thinking about how they could apply those back office conversion rules, so that when they became effective, a BOC process could be used. Those rules were known. I think Judge Chen is saying that if those rules were known, as he reads Claim 1, it's pretty broad. It's not limited to that scanning occurring by a third party, and so therefore you could, under the back office conversion rules, might read on Claim 1. I think that's what I understood him to be saying. The way people understood that you could do back office conversion before Salyutran's patent came along was that you'd do all of those steps in the back office. You wouldn't infringe this patent, because there wouldn't be the physical movement of the checks to another place to accomplish the digital image scanning and then the comparing and matching step. So it's the receiving said paper checks. Right, and the district court specifically construed that term to require that there be movement of the checks, which is what the patent talks about. Away from the point of purchase, but that would encompass down the hallway into a back room. Yeah, but in the back office conversion process before Salyutran's invention, and this is a point we specifically debated in front of the PTAB before we came to this court the first time, and the PTAB found in our favor on this question, in the back office conversion context, all of that happens in the same place. All of that happens in the back office. There's no movement of the checks such that the 945 patent could be infringed. Can I ask you another question? I understand opposing counsel to be arguing that your ordered combination itself is an abstract idea. Maybe I'm misunderstanding your argument. And don't our cases hold that the abstract idea itself can't be the thing that you rely on for the inventive concept? Sure they do, but I don't think that that, if that's what U.S. Bank is arguing, I don't think that that should be a successful argument here. So the jumping off point on that, of course, is what is the claimed advance? We're looking at the claim as a whole. We're trying to understand what the focus of the claimed advance was. And it could be helpful in this case that the district court identified a claimed advance that both sides explicitly agree with. So the district court at appendix pages 51 and 52 said that the 945 patent purportedly improves upon the prior art through the processing of paper checks via two paths at different times and locations and the physical movement of paper checks. That's what the district court said the claimed advance was. U.S. Bank? The way I look at the claimed advance as described in the summary of the invention, it's the crediting of the merchant's account and provision of funds in the merchant's account at a much earlier point in time in the overall check processing exercise. And if that's the case, then the claimed advance is for merchants to be able to get their money faster. And that sounds like an abstract idea. And then when I look and try to figure out from your claimed invention, to what extent has there been any improvement in the underlying check processing technology, which is something that we often look for, if not all the time we look for, when we find a patent eligible claim. I don't see anything that can necessarily be regarded as an improvement in the exercise of creating a data file that represents the check data or the exercise of scanning a check, that technology. I don't see anything different than that. And the crediting of a bank account, I don't think I see anything that's technically an improvement there. So I'm getting a little bit worried about the claim then, if I don't see any improvement in underlying technology and I see that the heart of the invention here is trying to get merchants' accounts credited earlier in the purchase exercise. So one of the things U.S. Bank argued vigorously was that our patent didn't get merchants their money any quicker. And if you look at the POP process at column two... I guess that's what I was wondering. Crediting the merchant's account at an earlier point in time, what does that mean? It just means a number is populated in the merchant's bank account, but the merchant can't actually access those funds quite yet, because there still has to be, I assume, some subsequent clearance that has to happen. Well, the crediting of the account is where the merchant does have access to the money, and there is actually a lot of detail about that in the infringement side of the case. I think the way the patent puts it is that there's a combination of benefits. What's improved here is the check handling procedure itself. So I grant you that there's not a specific technical change in the way the data file is constructed or in the way the crediting occurs. And if you look at the POP process that we were talking about earlier, Judge Chen, in paragraph two, that provides for similarly prompt crediting of an account. What this process did, the reason Cellutran was able to get this patent and what it explained in its specification, was that by changing the physical process for handling the checks in the way I've described, you could get a combination of benefits. The patent starts out in the very beginning of the abstract by speaking of a method of processing paper checks that divides into two independent paths. And why does that make anything better? It makes it better because you get the combination of early crediting of the account, which the merchant's very interested in, and, for example, the summary of the invention speaks of the merchant in column three, lines 58 through 65, speaks of merchants are relieved of the task, cost, and risk of scanning and destroying the paper checks themselves. So this is the outsourcing of the check scanning to a third-party processor, right? It would not necessarily have to be outsourcing. You could do it all yourself as a merchant. Well, that wouldn't be an advantage. Your advantage is that you're relieving the merchant of the exercise of check scanning. You could do it either way. And the disposal of the paper checks. But you don't get the benefit, right? If the merchant has to do it, they don't get the benefit you just mentioned. Fair enough. And what the 945 patent offers is it unlocks the benefits. But where in claim one does it talk about, okay, this is all going to be done by somebody else that's not the merchant. You know, it's drafted in this elliptical passive voice where we are receiving data, some magic person is crediting an account, and then we're receiving paper checks, scanning paper checks, and then comparing the digital image against the digital file. Claim one doesn't require that it be done by somebody other than the merchant. Right. But claim one certainly allows that it be done by somebody other than the merchant. And what the inventors were pointing out was that that's an advantage that the merchant can get from this invention. Right. If the claim was scoped down to the fact that somebody other than the merchant is doing it, then you're right, and that advantage would be captured and the claim to be right-sized in correspondence to that advantage. I think I get Your Honor's point. I don't take U.S. Bank's critique of this to be that there's a problem with the fact that you could outsource under this patent or that it's too broad because it allows for infringement by the merchant itself. The inventors came to the patent office and said, we've come up with this invention that allows for these benefits to be unlocked, that allows for this particular combination of benefits for the merchant to get those. And in order to get those, the merchant can do it in various different ways, but captures the data at its point of purchase, sends off the checks physically to someone who performs the four steps of claim one. When you say it sends off the checks to someone, the claims don't, just to confirm, they don't actually, they're not restricted to sending it off to somebody else. Is that right? They have to be sent off to someone who receives them in step C. And we know from the district court's construction that's not been challenged that that receiving at step C is in a different place. Right. But I guess what I'm saying is that we agreed already that that could include the back office. No, because under the back office conversion process, the initial scanning of the check to check the MICR data and get the transaction data is not occurring at the point of sale. It's occurring in the back office. Right. But that's the different location. Well, but the different location that we're talking about here is the difference between where the data are captured that come into play in step A, the data file that gets received, and then where the checks are received in step C. Those things have to be different. Right. Step C is the point of purchase? Step C is where the checks are received later after they've been initially scanned and the account has been credited. Step C is where they're received later for image scanning. That has to occur someplace else. So that can't be the back office in the back office conversion rules. Thanks. I have a question. I can see how the district court emphasized the physical nature of scanning the checks and sending the checks, and I can appreciate that vacuum in terms of understanding how that might connote that something's not abstract. But how do you deal with our court's precedent in cases like content extraction, inventor holdings, and there's one other that's mentioned in the blue brief, data treasury. How do you deal with those cases that involve similar physical activity and yet this court said that they were directed to an abstract idea and ineligible under 101? I think it goes back to what is the focus of the claimed advance. There's a litany of cases from this court, as everyone here knows, and content extraction is a great example, where the nature of the claimed advance was in that case, for example, it was in collecting data, recognizing certain data within the collected data set, and storing that recognized data in a memory. The focus of that claimed advance in that case was about data manipulation. And as we point out in our brief, there are lots of cases where the court has realized that the claimed advance was in data manipulation. That's not the case here. That's why the claimed advance in this case and what the district court held and all parties agree on is so significant. What's central to this claim, what's central to the 945 patent, is the physical handling of the checks. You see, for example, in the background of the invention section, the very first heading speaks of the history of physical, let me get it right, speaks of how paper checks were physically processed historically. So that the central nature of the claimed advance here, was the physical handling of tangible objects. That's what the district court held. That's what everybody here has agreed. That can't be said of any of those other cases. Let me ask you a hypothetical. What if there were a situation where there were really important documents that businesses are handling and they need to get those important physical documents across town, and so they've always asked their employees to somehow get across town to deliver those very important physical documents in the same day. But somebody invents bicycle messengers that can get through traffic faster. And now you can outsource the delivery of these important physical documents across town in the same day to this bicycle messenger service that can navigate through traffic quickly and be able to get these physical documents across town with great alacrity and special dispatch. That's a physical handling of documents, getting from point A to point B, perhaps in a faster way than had been done before, a more efficient way, and it relieves companies from having to deal with their own delivery of these important physical documents on their own. Would you say that that's a patent-eligible method? I don't know. What I can say is that that's a piece of what's going on here. That's perhaps a piece of the analysis here, but it's not all of the analysis here. Because the claim that I just described is unlike any claim that we've found patent-eligible. I guess I'd need to think more about the particular hypothetical. I think that's one piece of many of the analysis that's involved here. What case of ours is closest to your facts where we found the claims patent-eligible? Which one should we look to for guidance and say, ah-ha, that's very close to this? So I'll acknowledge this is not a case where we're claiming where the argument is that we've improved, for example, as we talked about earlier, the technical process of creating the data file. But it is a case that's in the central respect similar to Deere or Thales VisionX, where there's a physical process that's occurring that businesses are using. That physical process has been done in a certain way, and the inventors come along and come up with a different way of doing that that provides benefits. That's what applies here. So you're saying Deere is the case that has the facts most similar to yours? I'd say Deere and Thales VisionX are useful in this analysis because they both involve physical processes that businesses use. They also help make the point that the concern that underlies all this, of course, is preemption. The concern is that there's something about using the abstract idea, which we don't believe exists here, but the one that's been offered up— Mr. Gilbertson, we've gone way over time. Okay. I just want to try to give you 20 seconds, whatever you want to say about said data. Okay, said data. Thank you, Your Honor. You've got 20 seconds. Fair enough. Said data is clearly from Step A, data that was captured at the point of purchase and contained in the data file. We know that said data includes both the amount and the MICR information. We know that from the specification at 5.26-29, 4.8-9, and 6.31-32. There's no reason to treat one piece of that said data differently than all the other pieces of that said data. We also have Claim 3 that specifically says that the comparison has to be done based on MICR information, which is exactly how U.S. Bank does its comparison. If that infringes Claim 3, it, of course, has to infringe Claim 1.  Thank you, Your Honor. Your Honor, unless the court has questions, we waive rebuttal. Thank you. Judge Hughes, thank you. The case is submitted.